ANN RAYMOND, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Raymond v. Commissioner
Docket No. 39768-87
United States Tax Court
T.C. Memo 1991-238; 1991 Tax Ct. Memo LEXIS 267; 61 T.C.M. (CCH) 2750; T.C.M. (RIA) 91238; May 29, 1991, Filed *267 Appropriate orders will be issued and decision will be entered for the petition. Petitioner and her husband, Charles Raymond, filed joint income tax returns for the years at issue, 1969 and 1970. Petitioner and Charles Raymond were divorced in 1974. In 1975 Charles Raymond pled guilty to Securities Act violations, mail fraud, and aiding and abetting for activities during 1969 and 1970. In 1976 respondent dropped criminal tax charges against Charles Raymond relating to those activities. Charles Raymond died in 1983. Respondent issued notices of deficiency to petitioner on November 5, 1987. Respondent relies on the fraud exception to the statute of limitations because of the fraud of Charles Raymond. Respondent does not allege fraud on the part of petitioner. Held: (1) Respondent has shown by clear and convincing evidence that at least some of the underpayment of tax was due to the fraud of Charles Raymond. Held: (2) The period for assessment of tax is extended for petitioner because of the fraud of Charles Raymond. Held: (3) Petitioner is eligible for relief as an innocent spouse under section 6013(e). Declan J. O'Donnell, for the petitioner. Bruce *268 A. Anderson for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION On November 5, 1987, respondent determined deficiencies in petitioner's Federal income tax of $ 62,499 for 1969 [1] and $ 125,379 for 1970. Respondent determined that part of the underpayment was due to fraud for 1969 and 1970. However, respondent did not determine an addition to tax for fraud under section 6653(b). *269 Petitioner's now-deceased husband, Charles Raymond, was convicted of fraudulent sales of securities, mail fraud, and aiding and abetting arising from his activities in years including 1969 and 1970. Petitioner's returns for the years in question were filed jointly with Charles Raymond. The issues for decision are: 1. Whether respondent has shown by clear and convincing evidence that at least some of the underpayment is due to fraud. We find that at least some of the underpayment in 1969 and 1970 was due to the fraud of petitioner's husband, and none was due to petitioner. 2. Whether the period for assessment of tax is extended for petitioner because of the fraud of her husband. We hold that it is. 3. Whether respondent's determination of petitioner's deficiency is correct. We hold that it is. 4. Whether petitioner is eligible for treatment as an innocent spouse under section 6013(e). We hold that she is. Unless otherwise provided, all statutory section references are to the Internal Revenue Code in effect for the taxable years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated *270 and are so found. 1. Petitioner
Petitioner resided in Denver, Colorado, when the petition was filed. She was born and raised in Colorado where she graduated from high school and attended secretarial school, but received no degrees. She worked for a short time as a typist and a model. She worked as an actress in a melodrama in 1958 to 1960. Petitioner was married in 1955 and had a child in 1956. She was remarried in 1960 and had her second child in 1961. She was putatively married to Charles Francis Raymond in 1967. However, the 1967 marriage was invalid, and they were legally married on February 9, 1969. Charles Raymond had four children by previous marriages. His four children were born in 1956, 1959, 1961, and 1963. Petitioner and Charles Raymond first separated about six months after their marriage. They made several attempts at reconciliation. After the separation and during the years at issue, petitioner's two children and two of Charles Raymond's children lived with her. Charles Raymond's other two children often stayed with her on extended visits. Petitioner did not work outside the home while married to Charles Raymond. They were divorced on August *271 6, 1974. Petitioner had no connection with the business affairs of Charles Raymond. She attended some social events with him attended by some of his business associates. Petitioner accompanied Charles Raymond on many business trips to Kansas and Ohio. They also went to the Bahamas. Petitioner and Charles Raymond had no joint checking accounts during the years in issue. They had a joint checking account later. There is no showing of how it was used. Charles Raymond paid all of the household bills. He gave petitioner enough money to be comfortable during the years in issue. Charles Raymond came from a wealthy family. Petitioner believed that Charles Raymond was a millionaire. During petitioner's marriage to Charles Raymond he purchased stock in her name, including shares in General American, Flico-Autobale, and Faberge. She had no knowledge of the purchases. Charles Raymond used the alias of "Carl Hoyt" and others. Charles Raymond also traded stock and commodities in the names of Gloria Shumate, which was petitioner's maiden name, and Randall Shumate. Petitioner did not know about the trading in these accounts, although she signed the account cards. Petitioner had an *272 account at the stock brokerage M. L. Fallick Co. She endorsed a check she recieved on the account, but she had no recollection of any trading. Charles Raymond paid petitioner approximately $ 32,000 to attempt to reconcile their marriage. Charles Raymond and petitioner applied for a loan to purchase a town house at 10214 Autumn Leaf Circle, Los Angeles, California, on March 1, 1970. The joint application stated that Charles Raymond and petitioner had community income of $ 136,000, and stock in Moray Oil Company, Inc., and Petroleum Credit Corp. exceeding $ 1,000,000. Charles Raymond made the mortgage payments on the town house. Charles Raymond and petitioner applied for a loan to purchase a house at 1525 Old Oak Road, Los Angeles, California, on April 26, 1971. The joint application stated that Charles Raymond and petitioner had community income of $ 112,000 and net worth of $ 469,000, including $ 410,000 in "marketable securities." Charles Raymond made the mortgage payments on the Old Oak Road house. On January 10, 1974, petitioner sold the Autumn Leaf Circle residence. Petitioner retained approximately $ 25,000 in net proceeds from the sale of the Autumn Leaf Circle town *273 house. A written agreement made in connection with the dissolution of the marriage and executed by the parties on June 19, 1974, respecting their marital rights and obligations, included the following provision: 4. Husband assumes and agrees to pay, and hold wife harmless from, all outstanding debts or obligations of the parties incurred by either party to date, together with all federal and state taxes of the parties to and including December 31, 1974. * * *
Petitioner and Charles Raymond were divorced on August 6, 1974. On November 25, 1974, petitioner sold the Old Oak Road home. She retained over $ 100,000 from the sale. Petitioner received furniture and personal effects from Charles Raymond after her divorce. After their divorce, Charles Raymond paid for the college education of petitioner's children. Petitioner received a Mercedes Benz automobile from Charles Raymond in the early 1980s. Petitioner had some separate income from rental properties and the sale of investment securities for the taxable years 1969 and 1970. 2. Charles Raymond's Business Activities
In 1969, Charles Raymond and Mori A. Schweitzer formed Moray Oil Co., Inc. (Moray). Moray later *274 formed or purchased Westland Minerals Corporation (Westland). Charles Raymond was president, chairman of the board, and shareholder of Moray and Westland. Joseph E. Foraker was vice president of Westland. Charles Raymond also was president and chairman of the board of the Petroleum Credit Corporation, Dubros, Inc., Rayco Drilling Corporation, and The Nassau Bank and Trust in Nassau, Bahamas. Later in 1969, Charles Raymond and Mori Schweitzer began a fraudulent scheme to sell alleged interests in oil wells in Kansas through Moray. A description of the scheme is found in Puscas v. Commissioner, T.C. Memo 1978-73. When an individual agreed to buy a well, a partnership was formed (Moray Producers). The investor was a limited partner. Moray, or a new corporation controlled by Moray, was the general partner. Charles Raymond received payments from the entities he controlled in 1969 totaling $ 39,765.95. Of this total, $ 10,000 purported to be a loan, and $ 9,270 a reimbursement. In 1970, these entities paid him a total of $ 120,644.93. Of this amount, $ 54,600.20 purported to be a loan and $ 2,000 an advance or reimbursement for travel. Effective January *275 1, 1970, Moray agreed to pay Charles Raymond a salary of $ 100,000 per year, effective immediately. The entities controlled by Charles Raymond paid premiums of $ 7,190 and $ 6,770.50 for officers' life insurance on his behalf during the taxable year 1970. These entities also made mortgage payments on homes owned jointly by Charles Raymond and petitioner. 3. Chronology
a. Filing of the Joint Tax Returns
The 1969 income tax return was dated September 14, 1970. The 1970 return was dated January 18, 1973. Charles Raymond told petitioner that he had extensions which allowed the late filing. b. Execution of Form 872
On August 28, 1973, Charles Raymond and petitioner executed a Form 872, consenting to an extension of the period to assess tax for 1969 until October 31, 1974. c. Indictment and Conviction of Charles Raymond for Securities Act Violations and Mail Fraud
On September 19, 1974, Charles Raymond was indicted on 25 counts for investment transactions involving Moray. The counts included fraudulent sale of securities, sale of unregistered securities, mail fraud, and aiding and abetting. Applicable parts of the indictment are quoted in Puscas v. Commissioner, supra. *276 Each count included charges that during the years at issue Charles Raymond unlawfully and wilfully employed a scheme to defraud, obtained money and property by means of untrue statements and omissions of material facts, and engaged in transactions which operated as a fraud and deceit upon investors. In November 1969, Charles Raymond, Mori Schweitzer and others formed a tax shelter involving Kansas oil wells; from November 1969 through July 1970, Charles F. Raymond diverted approximately $ 500,000 from the Moray Oil Programs for purposes unrelated to drilling the Kansas wells including for his personal use and benefit; and that these diversions were concealed by Charles Raymond from investors and prospective investors. On May 20, 1975, Charles Raymond pleaded guilty to counts 1 through 14 (violation of 15 U.S.C. sec. 77q(a), 77e(a)(2), and 77x; 18 U.S.C. sec. 1341; 18 U.S.C. 2). On May 21, 1975, a judgment and commitment order was filed ordering Charles Raymond imprisoned for 15 months beginning May 27, 1975. d. Criminal Tax Investigation of Charles Raymond
Respondent conducted a criminal tax investigation of Charles Raymond, Mori Schweitzer, Westland Minerals Corp., Moray *277 Oil Company, the Moray Producer partnerships, and other entities controlled by Charles Raymond for the taxable years 1969 through 1972. The criminal tax investigation began on January 1, 1973. On June 28, 1974, the criminal tax investigation was completed and the case was forwarded to District Counsel. On March 24, 1975, District Counsel referred the criminal tax case to the Department of Justice. On May 7, 1975, Charles Raymond filed amended returns for 1969 and 1970 to take advantage of a net operating loss carryback. On May 25, 1976, the criminal tax charges were dropped because of Charles Raymond's guilty pleas to the securities, mail fraud, and aiding and abetting charges. e. Civil Tax Case
On May 25, 1976, the Examination Division was authorized to proceed with the civil case. On February 1, 1977, Charles Raymond provided respondent with a document that detailed stock transactions in which he was involved for the taxable years 1970 through 1973. In June 1977 the examination was completed, and a revenue agent's report was forwarded for review. On July 18, 1977, respondent received a waiver of assessment for Charles Raymond for 1969 for respondent's alternative *278 position and for 1970. The waiver was signed by Mr. Anthony Truax, representing Charles Raymond. The waiver also included additions to tax for fraud under section 6653(b) for both years. Charles Raymond agreed to the assessment of the full amount of the deficiencies determined by respondent, including the imposition of the fraud addition, for 1969 and 1970. The review staff closed the case in September 1977. The assessment against Charles Raymond was made in October 1977. On February 9, 1978, respondent issued a 30-day letter to petitioner. It was sent to 10214 Autumn Leaf Circle, Los Angeles, California 90024, with a copy of the revenue agent's report for the years at issue. It was not received by petitioner until April 5, 1978, because she had returned to Colorado. By letter dated April 8, 1978, Mr. Robert Haugen, a certified public accountant, confirmed a telephone call to respondent, and requested that the case be transferred to Colorado, where he and petitioner were located. In that letter he enclosed a power of attorney form for himself, and stated that he and Mr. Stan Drexler, an attorney, represented petitioner. He also asked for an extension of 30 days from the *279 date that petitioner received the 30-day letter to prepare a protest. This was petitioner's only request to transfer the case. Mr. Haugen and Mr. Drexler were hired by Charles Raymond to assist petitioner. This was consistent with Charles Raymond's agreement to pay all taxes from their years of marriage. On April 15, 1978, respondent wrote to petitioner, addressing the letter to 4852 Morella, North Hollywood, California 91607. The record does not show why respondent used this address. The letter stated that they had not received a power of attorney. The letter also stated that the 30-day period would not be extended, and that a statutory notice of deficiency would be issued if respondent did not hear from petitioner by April 30, 1978. After the April 15, 1978, letter was sent, respondent located the power of attorney form from Mr. Haugen. Respondent's agent Betzer said that she thought the power of attorney had been separated from Haugen's letter while respondent was processing it, implying that was the reason respondent used the incorrect address. On April 17, 1978, respondent sent a letter to Mr. Haugen stating that they had received a valid power of attorney, the 30-day *280 period to protest would be extended to May 8, 1978, and that the case would be transferred to Colorado after the protest was received. Mr. Haugen and Mr. Drexler filed a timely written protest on May 5, 1978. The case was transferred to Denver, Colorado, on May 31, 1978. In September 1978, the Collection Division deemed the taxes assessed Charles Raymond to be uncollectible. Respondent transferred the case back to Los Angeles to answer questions that the Denver examiner could not ascertain from the case file. It was again transferred to Denver on July 11, 1979. Neither of these transfers were requested by petitioner. On July 20, 1979, the revenue agent in Denver made a July 25, 1979, appointment with Mr. Drexler. They met and decided an interview with petitioner would be necessary. The interview was scheduled for September 7, 1979. On September 7, 1979, respondent's revenue agent interviewed petitioner in the offices of Mr. Drexler. Mr. Anthony Truex, Charles Raymond's counsel from Los Angeles, was also present. On September 19, 1979, Mr. Drexler wrote to the agent stating petitioner's positions relating to innocent spouse status, the statute of limitations, and additions *281 to tax for fraud. The agent contacted Mr. Drexler on October 4, 1979, to dispute petitioner's positions. Mr. Drexler and the agent met again on October 10, 1979. On October 23, 1979, Mr. Drexler informed the agent that he was no longer petitioner's representative and that Mr. Truex was petitioner's new representative. Sometime between October 23, 1979, and January 14, 1980, the case was transferred to Los Angeles. Petitioner did not request the transfer. Respondent knew that petitioner resided in Colorado at that time. On January 14, 1980, respondent received a new power of attorney for Mr. Truex. On February 10, 1981, respondent's review staff in Los Angeles decided to reissue the 30-day letters. This 30-day letter was identical to the one sent in 1978. Petitioner filed another written protest dated November 24, 1981. Respondent received it in Los Angeles on March 8, 1982. Respondent's reviewer forwarded the case to respondent's Los Angeles Appeals Division on July 22, 1983. Charles Raymond died on October 29, 1983. On September 5, 1985, the Los Angeles Appeals Division asked petitioner if Mr. Truex was still her attorney and where she desired her appeals conference. *282 On September 15, 1985, respondent received a letter from petitioner stating that Mr. Truex was no longer her power of attorney and requesting a conference. On October 31, 1985, the case was transferred to the appeals division in Colorado. On December 5, 1986, respondent received a new power of attorney from Mr. Drexler and Mr. Benjamin Spitzer. On March 11, 1987, the appeals officer assigned to this case received a letter from a Member of Congress from Colorado asking about the status of the case. On April 6, 1987, the appeals officer wrote to the Member of Congress to state that they were in contact with petitioner and that her case was being processed. On May 1, 1987, the appeals officer wrote to petitioner stating that a notice of deficiency would be issued. The appeals officer sent the file to District Counsel for review of a draft statutory notice of deficiency on May 12, 1987. On August 1, 1987, District Counsel authorized issuing the notice of deficiency. On June 2, 1987, the appeals officer received a request from a handwriting expert who had been retained by petitioner's counsel seeking copies of the tax returns to determine whether the signatures were those of petitioner. *283 On September 16, 1987, the expert sent a letter to the appeals officer enclosing a power of attorney form that had been inadvertently picked up by the expert from respondent's offices. On September 22, 1987, Mr. Drexler revoked his power of attorney. On September 25, 1987, the appeals officer prepared a statement supporting issuance of the notice of deficiency. The following day, respondent sent a letter to petitioner conceding adjustments for 1971 and 1972. The statutory notices of deficiency for 1969 and 1970 were issued on November 5, 1987. 4. Witnesses
Three potentially essential witnesses were unavailable to petitioner at the time of trial. Charles Raymond was deceased. Neither petitioner nor respondent could locate Mori A. Schweitzer or Joseph E. Foraker, vice president of Westland Minerals, a Moray subsidiary. Petitioner also claimed, and respondent did not dispute, that she did not have access to her ex-husband's books and records. 5. The Tax Returns Filed by Petitioner and Charles Raymond
Petitioner filed joint income tax returns with Charles Raymond for 1969 and 1970. She did not participate in preparing the income tax returns. Charles Raymond *284 omitted income from the 1969 return in the amount of $ 39,565.85 and from the 1970 return in the amount of $ 52,924. He also claimed deductions for partnership losses for Moray Producers in 1969 in the amount of $ 71,100 and in 1970 in the amount of $ 82,950. In 1970, Charles Raymond deducted $ 49,164 for short-term capital losses from stock sales through Heinhold Commodities. Petitioner did not know of the activities which led to Charles Raymond's Securities Act and mail fraud convictions or about the circumstances which gave rise to the omissions from income or the disallowed deductions. OPINION 1. Fraud of Charles Raymond
Petitioner argues that the period for timely assessment of tax has expired. Generally, there is a three-year period for assessment of tax. Section 6501(a). It is undisputed that the notice of deficiency was sent considerably later than three years after the 1969 and 1970 returns were filed. However, if there is a false or fraudulent return with the intent to evade tax, the three-year limit does not apply. Section 6501(c)(1). Respondent has the burden of proving by clear and convincing evidence that an underpayment in income tax exists, and that *285 at least part of the underpayment was due to fraud. Sec. 6501(c)(1); Sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Where fraud is determined for more than one year, respondent's burden applies separately for each year. Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1 (1980); Stratton v. Commissioner, 54 T.C. 255 (1970). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85 (1970). Fraud, however, may be inferred by any conduct, the effect of which is to mislead or conceal, Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943), or otherwise prevent the collection of taxes, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), *286 affg. T.C. Memo 1966-81; or where an entire course of conduct establishes the necessary intent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. a Memorandum Opinion of this Court; Kotmair v. Commissioner, 86 T.C. 1253, 1260 (1986); Rowlee v. Commissioner, 80 T.C. 1111 (1983); Stone v. Commissioner, 56 T.C. 213 (1971). The sophistication of the taxpayer is also relevant to the determination of fraud. Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946). The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, supra at 499. Generally, attempting to conceal illegal activities is a badge of fraud. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986); Milito v. Commissioner, T.C. Memo 1989-146. The use of aliases or fictitious names to conceal income is also evidence of fraud. See Milito v. Commissioner, supra; Cooperstein v. Commissioner, T.C. Memo 1984-290; *287 Yu v. Commissioner, T.C. Memo 1973-188; Staff v. Commissioner, T.C. Memo 1954-59. A taxpayer's dishonesty in business transactions or defrauding others may indicate a willingness to defraud respondent. McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Sullivan v. Commissioner, T.C. Memo 1989-30. We conclude that respondent has proved by clear and convincing evidence that the understatement for 1969 and 1970 is due at least in part to fraud by petitioner's husband, Charles Raymond. He promoted abusive tax shelters which were the subject of his guilty pleas to criminal charges in a Securities and Exchange Commission indictment. The counts to which he pled guilty indicated significant fraudulent activity and substantial concealed and unreported income. Mr. Raymond also used aliases or fictitious names to conceal income. He was dishonest in his business dealings. He admitted fraudulent business behavior in his guilty plea. He had large amounts of unreported income. Petitioner argues that respondent fails to carry the burden of proving fraud because *288 he relies upon indirect, unclear, and argumentative evidence. We disagree. Fraud may be proven by circumstantial evidence, including the implausibility of the taxpayer's explanations, Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court, because direct evidence of the taxpayer's intent is rarely available. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986); Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). 2. Statute of Limitations Not Tolled as to Petitioner
Petitioner contends that even if we find that Charles Raymond committed fraud, the statute of limitations should not be tolled as to petitioner because she did not commit fraud. We disagree. Petitioner did not commit fraud in this case. However, fraud by her husband with whom she filed a joint return also tolls the statute of limitations under section 6501(c) for her. Ballard v. Commissioner, 740 F.2d 659, 662-663 (8th Cir. 1984), affirming in part (re husband) and reversing in part (re wife) T.C. Memo 1982-466 *289 (innocent spouse signed joint return with fraudulent husband); Benjamin v. Commissioner, 66 T.C. 1084, 1101 (1976), affd. 592 F.2d 1259 (5th Cir. 1979); Vannaman v. Commissioner, 54 T.C. 1011, 1017-1018 (1970). Petitioner argues that the fact that respondent had all information about Charles Raymond's fraudulent activities causes the statute of limitations to run under section 6501(c)(1) relying on Dowell v. Commissioner, 614 F.2d 1263 (10th Cir. 1980), revg. and remanding 68 T.C. 646 (1977). Dowell was decided by the United States Court of Appeals with venue over an appeal of this case. In Dowell, the Tenth Circuit said: The purpose of § 6501(c) is to provide the Government time to unearth information the taxpayer did not furnish and to file an assessment. Once the Government has the information * * * as said in Bennett [v. Commissioner, 30 T.C. 114, 123-124 (1958)], "there can be no policy in favor of permitting assessment thereafter at any time without limitation." * * *
Dowell v. Commissioner, supra at 1266. This Court followed *290 Dowell v. Commissioner, supra, in a reviewed opinion. Klemp v. Commissioner, 77 T.C. 201 (1981), revd. 725 F.2d 1488 (9th Cir. 1984). However, and more importantly, the Supreme Court in Badaracco v. Commissioner, 464 U.S. 386, 78 L. Ed. 2d 549, 104 S. Ct. 756 (1984), held that where a taxpayer files a false or fraudulent return, but later files a nonfraudulent amended return, section 6501(c)(1) applies and the tax may be assessed at any time. 3. Deficiency Determination
Respondent's determination is presumed to be correct, and petitioner bears the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Petitioner has not convinced us that the deficiency determination was incorrect. Petitioner's ability to do so was restricted by the fact that key witnesses and business records were no longer available for trial. Before trial petitioner filed motions to shift the burden of proof. We view petitioner's argument as directed toward shifting to respondent the burden of going forward with the evidence. See United States v. Janis, 428 U.S. 433, 49 L. Ed. 2d 1046, 96 S. Ct. 3021 (1976). The motion was denied *291 without prejudice on the grounds that petitioners had not established actual prejudice, citing Riland v. Commissioner, 79 T.C. 185, at 197-198 (1982). At trial petitioner raised the doctrine of laches and moved that respondent be sanctioned for the delay. The Court took the motions under advisement. At trial petitioner also filed "Petitioner's Affidavit of Prejudice Based On The Passage of Time." Petitioner argues that her due process rights were violated and asks that the burden of going forward be shifted to respondent. In light of our holding below on the innocent spouse status of petitioner we do not reach these issues. 4. Innocent Spouse Treatment
Petitioner contends that she is not liable for the deficiency in tax at issue in this case on the grounds that she is an innocent spouse under section 6013(e). Generally, if a husband and wife file a joint income tax return, their liability for the tax is joint and several. Sec. 6013(d)(3). However, section 6013(e) provides an exception to this general rule by relieving the innocent spouse from tax under specified circumstances. Sec. 6013(e)(1). Petitioner must prove that she satisfies each of the *292 requirements of section 6013(e)(1). Shea v. Commissioner, 780 F.2d 561 (6th Cir. 1986); Rule 142(a). Section 6013(e) provides as follows: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES. -- (1) IN GENERAL. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
a. Joint Returns
Petitioner and Charles F. Raymond filed joint returns for the taxable years 1969 and 1970, and so the *293 requirement of section 6013(e)(1)(A) is met. b. Grossly Erroneous Items
"Grossly erroneous items" include any item of omitted income and deductions which have no basis in fact or law. Sec. 6013(e)(2)(B). Amounts of $ 39,565.85 in 1969 and $ 52,924 in 1970 were omitted income, thus grossly erroneous. A deduction which has no basis in fact or law is one that is "frivolous, fraudulent, or * * * phony." Douglas v. Commissioner, 86 T.C. 758, 763 (1986), affd. by unpublished opinion (10th Cir. 1989). Thus, if petitioner cannot prove that the disallowed deductions for the taxable years 1969 and 1970 had no basis in fact or law, she is not entitled to relief as an innocent spouse as to those deductions. Therefore, for 1969, petitioner must prove that the deduction for $ 71,100 of partnership losses for Moray Producers was grossly erroneous. For 1970, petitioner must prove that the deductions for $ 82,950 of partnership losses for Moray Producers and $ 49,164 of short-term capital losses from stock sales were grossly erroneous. We conclude that these deductions are grossly erroneous. The deductions relating to Moray ($ 71,100 in 1969 and $ 82,950 in 1970) *294 arose directly out of business activities of Charles Raymond which led to his conviction for Securities Act violations, mail fraud, and aiding and abetting. Under these circumstances, no substantial legal argument can be made to support the deductibility of the expenses. Douglas v. Commissioner, supra.We reach the same conclusion for the deduction for short-term capital losses through Heinhold Commodities ($ 49,164 in 1970). We consider this item in the context of overwhelming evidence of Charles Raymond's wide-ranging fraudulent financial activities and all the facts and circumstances present here. In this context we find this deduction to be grossly erroneous. We note that petitioners attached statements to their 1970 return from Heinhold Commodities that there were losses in this amount in the final months of 1970. However, the entire record with respect to Charles Raymond's fraudulent financial activities supports a finding that these items are grossly erroneous. c. Knowledge of the Understatement
Petitioner must show that she did not have either (1) actual knowledge of the substantial understatement; or (2) reason to know of the substantial *295 understatement. Sec. 6013(e)(1)(C); Estate of Jackson v. Commissioner, 72 T.C. 356 (1979). A spouse is not required to have perfect knowledge of the family's finances, however, she cannot close her eyes to unusual or lavish expenditures. Commissioner v. Mysse, 57 T.C. 680, 699 (1972). Petitioner did not know about the circumstances which gave rise to the omissions from income or the disallowed deductions. She did not know of the activities which led to Charles Raymond's Securities Act and mail fraud convictions. She was not involved in his business other than to go with him to social events attended by people with whom he did business, and to go on business trips with him. Petitioner thought Charles Raymond and his family were wealthy. Charles Raymond did not discuss his investment activities with petitioner. He did not tell her he used aliases, including her maiden name. Petitioner's signature appears on two residential loan applications which showed significantly more income than was reported. One of the loan applications was dated March 1, 1970, about six and one-half months before the date on the 1970 tax return (September 14, *296 1970). The other loan application was dated April 26, 1971, about 21 months before the date on the 1970 return (January 18, 1973). However, in the context of her exclusion from his business activities and all the facts and circumstances here, these facts are not enough to lead us to conclude that she knew or should have known of the substantial omission. There was no change in petitioner's standard of living during the time she was married to Charles Raymond. His support for her continued throughout the period at issue, but not in ways that were excessive for him in the context here. We conclude that petitioner has shown that she did not know, or have reason to know about the substantial understatement. d. Equitable to Relieve Spouse from Tax
To be entitled to relief as an innocent spouse, petitioner must also establish that, in taking into consideration all of the facts and circumstances, it is inequitable to hold her liable for the tax deficiencies attributable to the substantial understatements of Charles Raymond. Sec. 6013(e)(1)(D). Petitioner and Charles Raymond were first separated in 1969, the first of the two years at issue here. She was not involved in her *297 husband's financial and business activities, other than socially. Petitioner was supported by Charles Raymond. He paid for their housing, tuition for their children (including those from petitioner's prior marriage), paid various other amounts to her during and after the years at issue, and bought petitioner a Mercedes Benz in the early 1980s, more than 10 years after the years at issue. However, we do not believe Charles Raymond increased this support as a result of the fact that the tax returns were fraudulent. Respondent argues that petitioner's lavish lifestyle is contrary to the amounts reported as income on the returns. However, petitioner believed that her husband came from a wealthy family. Her lifestyle was consistent with her belief. Evaluating this issue is difficult because petitioner at the time of her testimony was substantially different, e.g., more mature, independent, and knowledgeable of financial matters than she was during the years at issue, some 20 years earlier. On balance, in considering all the facts and circumstances, including the long passage of time between the years at issue and the trial, we conclude that it would be inequitable to hold petitioner *298 liable for the deficiencies in tax determined by respondent. Having met the four requirements provided in section 6013(e), petitioner is entitled to treatment as an innocent spouse. To reflect the foregoing, Appropriate orders will be issued and decision will be entered for the petitioner. Footnotes
1. The Court notes that at the time the statutory notices of deficiency were issued, respondent determined a primary and alternative deficiency for 1969. The primary deficiency was $ 33,587 with additions to tax of $ 8,397 under section 6651(a)(1), $ 1,738 under section 6653(a), and $ 1,065 under section 6654. The alternative position with no additions to tax is as stated above if petitioner filed a joint return. The parties agree that petitioner filed a joint return, thus respondent's alternative position applies. Respondent apparently believes the alternative position also includes additions to tax under sections 6651(a)(1), 6653(a), and 6654, but they are not included in the description of the alternative position in the notice of deficiency, and so we do not consider them.↩